IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

WILLIAM GILCHRIST,

       Petitioner,               No. CIV S-04-0920 FCD KJM P

   vs.

A.A. LAMARQUE, Warden,          ORDER AND

       Respondent.           FINDINGS AND RECOMMENDATIONS

_____/

       Petitioner is a state prison inmate proceeding pro se with a petition for a writ of habeas corpus under 28 U.S.C. § 2254.  He challenges his Sacramento County convictions for robbery, assault with a deadly weapon and false imprisonment on two grounds: (1) the prosecutor committed misconduct by using a suggestive method to encourage eyewitnesses to identify petitioner and trial counsel was ineffective in failing to object; and (2) trial counsel was ineffective in failing to object to his non-testifying co-defendant's videotaped statement being admitted during their joint trial.  He also has filed a request that the record be expanded to include a variety of police reports of statements taken from eyewitnesses to the robbery.

/////

/////

/////

1

I. Factual Background

Based on a review of the record, this court has determined that the state Court of Appeal's summary accurately reflects the facts as developed in the trial court:

Shortly before noon on October 8, 1998, three black men entered a crowded credit union. When the men entered, between five and 15 customers waited in line to see a teller.

Defendant grabbed branch supervisor Leslie Howton and pulled her to the floor. He dragged Howton to the end of the teller line, waived [sic] a gun, and announced a hold up.

One of the men ordered everyone down on the floor. Another of the robbers approached branch manager Debra Black, pointed a gun at her chest, and told her not to move. He then ordered her to the ground.

Black saw another robber standing near the teller line. The robber said: "Do what he says and nobody will get hurt." Defendant and this robber pointed semiautomatic handguns in the air.

Defendant went behind the counter and ordered a teller, Courtney Hufnagle, to put all the money from her drawers in the vault and the teller station into his backpack.

Defendant returned to Howton and asked if she had the keys to the safe. He pointed a gun at Howton's chest and ordered her to accompany him to the vault room. He then directed her to open the safe. Howton opened the safe and defendant removed most of the money. Defendant told Howton to lie down in the vault room. Defendant then left the vault.

The robbers ordered all the customers and staff into the vault. The robbers told the approximately 13 people to lie down on the floor in the vault room. Eventually, someone looked outside the vault and said the robbers were gone. Black, the branch manager, called the police. The robbers left with $5,301.

Following the robbery, defendant and his two companions crossed the credit union parking lot and hopped over a fence into a residential neighborhood. A resident, Brian McCullough, saw the three men running and gave chase.

At a nearby intersection, two of the robbers climbed inside a waiting car and drove away. McCullough caught up with the heaviest robber at another car. The robber got into the car and drove away; McCullough noted the license number. Several weeks

later, McCullough[1] identified a photograph of defendant as one of the men he pursued.  At trial the prosecution asked McCullough to find his signature on the back of the photograph.  McCullough then identified defendant in the courtroom.

Later that afternoon, detectives learned codefendant Michael Johnson owned the car that the heavyset robber drove away in.  En route to interview Johnson, a sheriff's detective spotted the car in a shopping center near Johnson's home.  The detective arrested the driver, Johnson, and his passenger, codefendant James Carr.  The detective found $1,170 and a bait bill from the credit union on the floor of the car.

Johnson gave a lengthy interview to police.  During the course of the interview, Johnson made numerous conflicting statements.  After the interview, detectives played the credit union surveillance video of the robbery for Johnson.  Johnson identified Carr, Tyrone Harris, and defendant as the three robbers shown on the tape.  Johnson stated defendant was the man wearing a white baseball cap and white jacket, carrying a black backpack.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . .  We summarize the testimony of the customers and employees of the credit union in our discussion of eyewitness testimony.

Johnson testified against defendant and Carr.  According to Johnson, on the morning of the robbery he went with his cousin Carr to his friend Harris's house.  At the house they found Harris, defendant, and defendant's girlfriend Leslie.  Harris introduced defendant to Johnson as his "Uncle Will."  Johnson described defendant as clean-shaven with his hair worn in cornrows.

Johnson and Carr left in Johnson's vehicle and followed Harris, defendant, and Leslie in Leslie's vehicle.  Johnson testified he was unaware of his companions' plan to rob a bank.  At a shopping center, Carr, Harris, and defendant got out of the cars and walked down the street.

Johnson drove around until his car stalled.  Leslie parked her car near him.  Shortly afterward, Harris, Carr, and defendant came running down the street, chased by four men.  Harris and defendant got in Leslie's car and drove away.  Carr left with Johnson.

Johnson found out about the robbery only after speaking with detectives.

---

[1]  In two places, the Court of Appeal spells this witness's name "McCollough."

1

2

3

> Defendant presented witnesses who testified he was out of the state at the time of the robbery.  Defendant's mother, Nadine Gilchrist, testified she took him to the bus station at the end of September 1998.  Defendant returned home to Denver, Colorado.

4

5

6

7

> Leslie testified she had not seen defendant since September 1998 when her car was impounded while in defendant's possession.  Leslie said defendant was in Colorado in October of 1998 and she did not see him again until the trial began.  The day of the robbery, Leslie spent the day at her grandmother's house.  She denied seeing defendant the day of the robbery.  Leslie's grandmother confirmed her granddaughter spent the day with her.

8

9

10

11

> Defendant testified he was in Denver, Colorado, the day of the robbery.  He testified he wore a white sweat jacket that he found at his mother's house in Sacramento but left it there when he returned to Denver.  Defendant admitted giving officers a false name when they arrested him in September 1998 for a "marijuana warrant."  He testified he arrived in Colorado on [sic] September 1998 and remained until he was extradited back to Sacramento.

12

13

> According to defendant, he is five feet six inches tall and has always had facial hair.  He weighed 197 pounds when arrested in September 1998.  Defendant also stated he had a hernia in his groin, making it difficult for him to run.

14

15

16

> Defendant originally moved to Colorado from Los Angeles to make more money dealing drugs and to escape harassment from the Los Angeles police.  Although he has no fixed residence, defendant stays with girlfriends and fellow gang members while in Colorado.

17  Answer, Ex. D (Court of Appeal opinion) at 2-6.

18  II.  Standards Under The AEDPA

19        An application for a writ of habeas corpus by a person in custody under a

20  judgment of a state court can be granted only for violations of the Constitution or laws of the

21  United States.  28 U.S.C. § 2254(a).  Federal habeas corpus relief also is not available for any

22  claim decided on the merits in state court proceedings unless the state court's adjudication of the

23  /////

24  /////

25  /////

26  /////

claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA").  See Ramirez v. Castro, 365 F.3d 755, 773-75 (9th Cir. 2004) (Ninth Circuit affirmed lower court's grant of habeas relief under 28 U.S.C. § 2254 after determining that petitioner was in custody in violation of his Eighth Amendment rights and that § 2254(d) does not preclude relief); see also Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003) (Supreme Court found relief precluded under § 2254(d) and therefore did not address the merits of petitioner's Eighth Amendment claim).[2]  Courts are not required to address the merits of a particular claim, but may simply deny a habeas application on the ground that relief is precluded by 28 U.S.C. § 2254(d).  Lockyer, 538 U.S. at 71 (overruling Van Tran v. Lindsey, 212 F.3d 1143, 1154-55 (9th Cir. 2000) in which the Ninth Circuit required district courts to review state court decisions for error before determining whether relief is precluded by § 2254(d)).  It is the habeas petitioner's burden to show he is not precluded from obtaining relief by § 2254(d).  See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

/////

/////

/////

/////

---

[2]  In Bell v. Jarvis, 236 F.3d 149, 162 (4th Cir. 2000), the Fourth Circuit Court of Appeals held in a § 2254 action that "any independent opinions we offer on the merits of constitutional claims will have no determinative effect in the case before us . . .  At best, it is constitutional dicta."  However, to the extent Bell stands for the proposition that a § 2254 petitioner may obtain relief simply by showing that § 2254(d) does not preclude his claim, this court disagrees.  Title 28 U.S.C. § 2254(a) still requires that a habeas petitioner show that he is in custody in violation of the Constitution before he or she may obtain habeas relief.  See Lockyer, 538 U.S. at 70-71; Ramirez, 365 F.3d at 773-75.

1    The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are

2    different.  As the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to"
> clause if the state court applies a rule different from the governing
> law set forth in our cases, or if it decides a case differently than we
> have done on a set of materially indistinguishable facts.  The court
> may grant relief under the "unreasonable application" clause if the
> state court correctly identifies the governing legal principle from
> our decisions but unreasonably applies it to the facts of the
> particular case.  The focus of the latter inquiry is on whether the
> state court's application of clearly established federal law is
> objectively unreasonable, and we stressed in Williams [v. Taylor,
> 529 U.S. 362 (2000)] that an unreasonable application is different
> from an incorrect one.

10   Bell v. Cone, 535 U.S. 685, 694 (2002).  A state court does not apply a rule different from the

11   law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply

12   fails to cite or to indicate an awareness of federal law.  Early v. Packer, 537 U.S. 3, 8 (2002).

13   The court will look to the last reasoned state court decision in determining

14   whether the law applied to a particular claim by the state courts was contrary to the law set forth

15   in the cases of the United States Supreme Court or whether an unreasonable application of such

16   law has occurred.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court fails

17   to give any reasoning whatsoever in support of the denial of a claim arising under Constitutional

18   or federal law, the Ninth Circuit has held that this court must perform an independent review of

19   the record to ascertain whether the state court decision was objectively unreasonable.  Himes v.

20   Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  In other words, the court assumes the state court

21   applied the correct law, and analyzes whether the decision of the state court was based on an

22   objectively unreasonable application of that law.

23   It is appropriate to look to lower federal court decisions to determine what law has

24   been "clearly established" by the Supreme Court and the reasonableness of a particular

25   application of that law.  See Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999).

26   /////

6

III.   Identification Procedures Before And During Trial

Petitioner argues that the witnesses' in-court identification of him as one of the robbers was tainted by the prosecutor's misconduct and that trial counsel was ineffective in failing to object to the prosecutor's methods.  The Court of Appeal described the factual background to the challenge; its determinations are entitled to deference.  Brothers v. Dowdle, 817 F.2d 1388, 1389 (9th Cir. 1987).

When the robbers entered the credit union, approximately 13 people were already inside.  Eleven people testified at trial: nine called by the prosecution and two by the defense.

A detective put together a photographic lineup, which contained a photograph of defendant taken less than a month before the robbery, to be shown to the credit union witnesses.  The detective testified he did not number the photographs to prevent witnesses from comparing identifications.  He also shuffled the photographs to create different lineups.

Prior to showing each witness the photographic lineup, the detective asked the witness to read a photographic lineup instruction sheet.  The instructions told the witness that an officer would show him a series of photographs, but the officer's participation should not influence the witness's response.  The person who committed the crime might or might not be in the group of photographs.  Nor was the witness required to make any identification.  The instructions also asked the witness to carefully study the photographs since an individual can alter or change his appearance by growing or shaving facial hair.

During the identification process, the detective asked the witness to sign the back of the photograph if the witness identified that individual as one of the robbers.  The detective initially handed the stack of photographs to the witness and asked the witness not to look at the back.  Some witnesses stacked the photographs one on top of the other, looking at them one at a time.  Other witnesses spread out all the photographs and looked at them simultaneously.

The detective explained that fading memories at the time of the trial were the reason for the witness signatures on the back of the identified photographs.  The signatures insured identification of the correct photograph months later.  Not all of the witnesses selected defendant's photograph.  To address defendant's challenge to the identification process, we briefly summarize the trial testimony of the witnesses.

/////

### Branch Supervisor Howton

During the robbery, Leslie Howton saw two robbers.  She described the man who pulled her down as of average height, five feet eight inches or five feet nine inches tall, 20 to 25 years old, and 150 to 160 pounds.  He had cornrows, a thin mustache, and a stocky build.  He wore white pants and a white shirt.  Howton did not recall if the man wore a cap.

Two weeks after the robbery, Howton viewed two photographic lineups.  She signed the backs of two photographs in the set containing defendant's photograph.  She signed the two photographs because the individuals pictured had the same hairstyle as the robber.  Howton testified one of the photographs, the photograph of defendant, looked more like the robber who threw her down.  At trial, the prosecution asked Howton to locate her signature on the back of the lineup photograph she had selected.  Howton then identified defendant as the robber who threw her down.

### Member Services Representative Drobny

When the robbers entered the credit union, Kara Drobny was in the employee break room.  She heard yelling and screaming, and peeked out to see two men with guns.  As she left the break room, she saw a robber a few feet away.  He wore a white or black baseball cap, a white shirt, and sweats.  He had black, curly hair and his face was either unshaven or pockmarked.  Drobny saw no mustache or beard.  Drobny estimated his height at five feet six inches to five feet eight inches.

At the photographic lineup, Drobny signed the back of defendant's photograph.  She was 100 percent certain the photograph was of the robber.  At trial, the prosecution asked Drobny to locate her signature on the photograph.  Drobny then identified defendant as the robber.

### Customer Wilhelm

Richard Wilhelm, a credit union customer, described the robber who threw Howton to the ground as a large man, about five feet nine inches tall.  The robber wore a white and black windbreaker, but Wilhelm did not remember a hat or backpack.

At the photographic lineup, the detective showed Wilhelm five photographs.  Although he was not positive about the identification, Wilhelm picked out at least one photograph.  He signed the back of the photograph.  The back of the photograph contained no other signatures.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Initially, Wilhelm testified the photograph depicted the robber who accosted Howton.  However, during cross-examination, Wilhelm testified the photograph was of another robber.  He failed to identify anyone in court.

### Branch Manager Black

Debra Black, the credit union branch manager, testified the robber who held her at gun point was not the same robber who threw Howton to the floor.  The robber who manhandled Howton wore a white or beige jacket with a hood and carried a black backpack.  The robber had facial hair but no mustache.

Interviewed shortly after the robbery, Black described the robber who threw Howton down as a black male about five feet 10 inches tall, stocky, with short dark hair, well-groomed, with no facial hair.  He wore a beige shirt and off-white pants, and carried a black nylon backpack.

At the photographic lineup, Black selected a photograph of the robber who threw Howton down.  She signed the back of the photograph.

At trial, Black identified her signature on the back of the photograph.  When she viewed the photographic lineup, Black did not look at the back of the photographs until after she made her selection.  When Black selected the photograph, she was 100 percent certain it was of the robber who pushed Howton to the ground.  In court, Black identified defendant as that robber and identified Carr as the robber in the teller line.

### Teller Hufnagle

Credit union teller Courtney Hufnagle described the robber who ordered her to get the money as wearing a jogging suit and carrying a black backpack.  She estimated his height as five feet six inches and said he had cornrows in his hair.  Following the robbery, Hufnagle described the robber as around 24 years of age, five feet eight inches tall, 145 pounds, wearing a white jogging suit and a baseball cap.

At the photographic lineup, Hufnagle signed the back of one photograph she identified as one of the robbers.  However, at trial, Hufnagle was unable to locate her signature on the back of the photograph.  Nor was she able to identify anyone in the courtroom.

/////

/////

9

### New Accounts Representative Weaver

New accounts representative Jenny Weaver stood near Howton's desk as the robber pulled Howton to the ground. Weaver described the robber as wearing a white jumpsuit and a rag on his head. She saw him for a few brief seconds.

Weaver later saw the second robber standing near the teller windows brandishing a gun. The second robber appeared to be of average height, heavyset, and clean-cut. Weaver remembered the third robber was a black male but remembered nothing else.

At the photographic lineup, Weaver selected one photograph as that of the robber wearing the white jumpsuit. She signed the photograph. At a second photographic lineup, Weaver identified another photograph as one of the robbers. She did not recall signing any photographs at the second lineup.

At trial, Weaver failed to identify any photographs in a group containing defendant's photograph. Nor could she identify anyone in the courtroom. However, during cross-examination she picked out a photograph of the second robber who stood next to the teller window. Weaver identified defendant as the man in the photograph.

### Customer Goedde

Angela Goedde, a customer, saw three robbers from her vantage point near the front door. The robber standing by the teller line was five feet seven inches and clad in a white jumpsuit, with hair pulled into a ponytail. This robber spoke the most and held a gun.

At the photographic lineup, Goedde picked defendant's photograph. She signed the back of the photograph. Goedde also believed a second photograph looked similar to the robber.

In court, Goedde picked out the photograph she had signed at the lineup. After some initial hesitation, Goedde identified defendant as the robber who stood by the teller's window and was the most talkative. She hesitated in her courtroom identification not out of indecision, but because she was in the same room with defendant.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..

### Customer Kenneth Tomlinson

Kenneth Tomlinson and his wife Anna Marie had just gotten to the front of the teller line when the robbers entered the credit union. The robber who stood near the teller line was well-dressed, stocky, around five feet 11 inches tall, and had short hair. The other robber, who herded people into the vault, was slightly shorter,

wearing a white jogging suit and baseball cap and sporting a goatee.  This robber's eyes appeared "doped up."

At the photographic lineup, Kenneth picked out one of the photographs because it looked very much like the robber who ordered them into the vault.  He picked the photograph because the subject's eyes and facial features were similar, not because the figure in the photograph wore white.  Kenneth signed the photograph, saying it was "about as close as any of the photographs I can see."  Tomlinson was not asked to identify anyone in court.

### Customer Anna Marie Tomlinson

Anna Marie stood at the front of the teller line with her husband as the robbers entered.  After the robbers ordered them into the vault, Anna Marie passed by the robber at the vault entrance.  The robber wore a jogging suit and hat with the Nike brand insignia.  He sported short curls and might have had a goatee.  She described the robber as short and thin.  He was somewhat taller than she (five feet three inches) and shorter than her husband (five feet 10 inches).

At the photographic lineup, Anna Marie signed the backs of two photos.  She believed the first photograph looked like one of the robbers.  When she saw the second photograph, she said "That's the man who robbed us."  The second photograph was of defendant.

At trial, Anna Marie reiterated her belief that the second photograph was of the robber.  She selected the first photograph because of the subject's beady eyes.  Anna Marie was not asked to make an in-court identification.

### Customer James

Robert James, called as a witness by the defense, followed one robber into the vault.  The robber carried a gun, weighed about 125 to 130 pounds, and stood about five feet 10 inches tall.  James described a second robber as a black male of about five feet 10 inches or six feet tall.

James could not pick out any of the robbers at either the photographic lineup or trial.  Nor was he able to recognize the robber he followed from the surveillance video.

### Customer Bell

The defense also called Herbert Bell, another credit union customer.  Bell was the only other African American besides the robbers in the credit union during the robbery.

11

Bell sat near Howton's desk when the first robber shoved Howton to the floor.  He saw the robber held a gun.  The robber had a slightly darker complexion, with a slight goatee.  Bell decided not to look in the robber's face and made no estimation of his height.

At the photographic lineup, Bell could not identify any of the robbers in the photographs.  According to Bell, the detective in charge of the lineup asked him to sign the photographs just to show he had looked at them.  Bell signed probably four or five of the photographs.  Bell identified his signature on the back of one of the photographs.

### Detective Minter

Danny Minter, the detective in charge of the photographic lineup, testified he showed Bell two photographic lineups: One contained codefendant Harris's photograph and the other contained defendant's picture.  Initially, Bell was hesitant about looking at the photographs, but eventually he narrowed the photographs down to defendant's photograph and one other picture.  Based on his eyes and complexion, Bell decided on defendant's photograph, but he was very uncertain about the identification.  The detective had Bell sign the back of the photograph.  However, he did not ask Bell to sign the picture just to show that he looked at it.

Answer, Ex. D at 7-15.  The Court of Appeal analyzed petitioner's challenge to the in-court identifications as including an underlying challenge to the photographic lineup and rejected both challenges:

In the conduct of a pretrial photographic lineup, a due process violation occurs only if the identification procedure is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.  Whether due process has been violated depends upon the totality of the circumstances. . . The defendant bears the burden of showing the procedure resulted in such unfairness that it abridged his or her rights to due process.  In general, a pretrial procedure will be found unfair if it suggests, in advance of a witness's identification, the identity of the person suspected by the police. . . .

Here, the lineup procedure described by both the detective . . . and the majority of witness participants cannot be described as unduly suggestive.  The detective conducted the lineups individually within a short time after the robbery.  The lineups began with witnesses reading the admonition and instructions, which informed them that they may or may not find a robber among the photographs.  Witnesses were instructed not to turn over the photographs until after they selected one.  Some witnesses failed to

/////

identify any photograph; others identified several.  The process was not so unnecessarily suggestive and conducive to irreparable mistaken identification.

Defendant claims the prosecution committed misconduct in asking witnesses to identify their signatures on the back of the photographs prior to making an in-court identification.  Defendant objects to the introduction of the out-of-court identification prior to an in-court identification.  In essence, defendant argues the prosecution failed to lay a proper foundation for introduction of the prior lineup identifications.

We will assume, for the sake of argument, that the prosecution's method of introducing the identifications amounted to evidentiary error.  We find such error harmless.

The prosecution followed this method with witnesses Howton, Wilhelm, Black, Goedde, Drobny, and McCollough.  However, each witness also testified as to the accuracy of his or her prior identification.

Howton described the photographic lineup and stated she picked the photograph that most clearly resembled the robber.  According to Howton, her photograph identification left no doubt in her mind as to its accuracy.  Wilhelm testified his memory of the robbery was fresher at the time of the lineup.  Goedde stated the photograph she identified bore more than just a resemblance to the robber.  Drobny testified she was 100 percent certain the photograph she chose at the photographic lineup was the robber.

McCullough estimated he was 90 percent certain of his photographic lineup identification.

Given this testimony and the circumstances surrounding the photographic lineup, we cannot find it more reasonably probable that a different result would have been reached had the witnesses begun with an in-court identification and then proceeded to testify regarding the photographic lineup identification.

Nor did defense counsel render ineffective assistance in failing to object to the prosecution's method of eliciting witness identifications. . . .

Defendant cannot establish prejudice in the present case.  Here, identity formed the core of defendant's defense.  However, in addition to the witnesses' strong endorsements of their identification of defendant in the photographic lineups held shortly after the robbery, the jury heard unequivocal testimony by Johnson, one of the drivers the day of the robbery.  Defendant was introduced to Johnson as Harris's Uncle Will.  Johnson testified he followed defendant and his companions' car to the shopping center

1  in which the credit union was located.  Defendant and his
2  companions later came running down the street, chased by four
   men.  The men got into the cars and fled.  This testimony, in
   addition to the witnesses' identification of defendant at the
3  photographic lineup, renders any error in introducing the out-of-
   court lineup harmless.
4

5  Answer, Ex. D at 17-20 (quotations, citations, footnote omitted).

6          A.  Pretrial Identification

7          An identification procedure violates a defendant's right to due process only if it is

8  so unreliable that it produces a "very substantial likelihood of irreparable misidentification."

9  Manson v. Brathwaite, 432 U.S. 98, 116 (1977); Neil v. Biggers, 409 U.S. 188, 198 (1972);

10  Simmons v. United States, 390 U.S. 377, 383 (1968) ("The chance of misidentification is . . .

11  heightened if the police indicate to the witness that they have other evidence that one of the

12  persons pictured committed the crime.").

13          In this case, the Court of Appeal determined that petitioner was not challenging

14  the manner in which the photographic display was assembled, but rather the fact that Detective

15  Minter asked the witnesses to sign the back of the photograph after making an identification.

16  Petitioner argues that "as the list on the back of a given photograph grew longer each witness was

17  made to feel more certain about the accuracy of the initial, perhaps tentative, identification."

18  Traverse at 19.

19          Although the Supreme Court has not specifically examined whether reinforcing a

20  witness's identification renders it suggestive, several Courts of Appeals and District Courts have

21  explored such scenarios.  For example, in United States v. Bagley, 772 F.2d 482, 494 (9th Cir.

22  1985), a police officer who had seen the driver of a car connected with a bank robbery looked

23  over the shoulder of the bank manager as she selected the defendant's picture from a photo

24  spread and later identified defendant as the driver of the car he had observed.  The Ninth Circuit

25  /////

26  /////

noted that "joint confrontation is a disapproved identification procedure," but did not ultimately

determine whether it was unnecessarily suggestive because it found that the officer's

identification bore sufficient indicia of reliability.  Id.

        In Monteiro v. Picard, 443 F.2d 311 (1st Cir. 1971), a family viewed a live lineup

together and then moved to a conference room, where an officer asked them if they could make

an identification.  The wife identified the defendant, followed by her husband and son, and then

the officer told them they had selected the right man.  Id. at 312-13.  The Court of Appeals found

this procedure to have tainted the in-court identification made by the husband and son.  Id. at

313; see also Swicegood v. Alabama, 577 F.2d 1322, 1326 (5th Cir. 1978) (after a line-up, police

told witnesses they had selected the "suspect that we had," one of several factors rendering the

lineup procedure suggestive).

        In United States v. Thai, the Court of Appeals observed that a police officer's

remarks after an identification procedure

> may tend to reinforce an otherwise weak or tentative identification
> . . . [but] if the original identification was strong and unequivocal,
> such misguided postidentification remarks or actions will not
> render it invalid or preclude a subsequent in-court identification.

29 F.3d 785, 810 (2d Cir. 1994).  In Thai, police showed a single picture of the defendant to one

witness after she had selected the defendant's picture from a photo array and told another witness

he had done a good job during the identification process.  The Court of Appeals found these

actions and remarks to be inappropriate, but not unnecessarily suggestive because the witnesses

had an adequate opportunity to observe the robbers.  Id. at 811.

        In Gregory-Bey v. Hanks, 332 F.3d 1036, 1047 (7th Cir. 2003), witnesses testified

that the police seemed happy after they selected defendant during a live lineup.  In addition,

while one witness immediately selected defendant, two others whispered that they were scared to

pick anyone because they were unsure whether defendant could see them through the glass.  Id. at

1040.  After the lineup, the two witnesses discussed their tentative identification of defendant,

1  which they later confirmed when the police showed them a videotape of the live lineup.  Id.  The

2  Court of Appeals did not find either of these circumstances to render the identifications

3  suggestive.  Id. at 1047-48.

4          Finally, in Jamison v. Collins, 100 F.Supp.2d 647, 745-46 (S.D. Ohio 2000), the

5  court rejected a claim that a lineup attended by several witnesses was suggestive when the record

6  did not make clear that the witnesses made their identifications out loud in front of the others or

7  otherwise violated the instruction that they not talk to the other witnesses.

8          In this case, although Detective Minter asked the witnesses to sign the back of the

9  photographs they selected, none of them said they turned the photographs over before they made

10  their selection or that any signatures they may have seen after selecting petitioner's picture had

11  any impact on them.  Reporter's Transcript (RT) 61-62, 69, 72 (Wilhelm; no other signatures on

12  the back of the photo); RT 100, 135 (Black); RT 169-170, 183 (Hufnagle); RT 194-197

13  (Weaver); RT 221-222 (Goedde); RT 250-252, 254 (Kenneth Tomlinson); RT 267-268, 270

14  (Anna Marie Tomlinson); RT 300, 326 (McCullough); RT 389 (Minter); RT 506 (Howton); RT

15  575-576, 604-606 (Drobny).  In fact, one defense counsel asked new accounts representative

16  Weaver, "Does having the signatures on the back of those two cards give you an indication that

17  co-workers or other people had selected them before and you might – should also?"; she said no.

18  RT 203.  In addition, Kenneth Tomlinson acknowledged there were other signatures on the back

19  of the picture he selected, but that did not "indicate anything" to him when he put his own

20  signature on the back.  RT 260.  Moreover, Minter did not tell the witnesses that the signatures

21  did not mean they had selected the right man or otherwise convey to them they had done a good

22  job during the identification procedure.  Cf. RT 429, 433-434, 438.  The state Court of Appeal

23  did not apply clearly established federal law unreasonably in determining that the procedure used

24  in this case was not unnecessarily suggestive.

25  /////

26

B.  <u>In-Court Identification</u>

As indicated above, the state Court of Appeal assumed that the prosecutor erred by asking the witnesses to find their signatures on the photographs before identifying either the pictures they had chosen when shown the photo array or identifying either of the defendants in court, but found the error harmless.

In <u>Fry v. Pliler</u>, ___ U.S. ___, 127 S.Ct. 2321, 2327 (2007), the Supreme Court held that a federal habeas court must apply the standard of review defined in <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993), in assessing the prejudicial impact of federal constitutional error in a state criminal trial.  Under <u>Brecht</u>, a constitutional error is harmless if it did not have "a substantial and injurious effect or influence in determining the jury's verdict."  Among the factors to consider in making this determination are the other evidence of petitioner's guilt and the extent to which the jury was apprised through examination and cross-examination of any weaknesses in the constitutionally suspect identification procedures.  <u>Williams v. Stewart</u>, 441 F.3d 1030, 1039 (9th Cir. 2006).

At least one juror was cognizant of the suggestive nature of the prosecutor's method of eliciting in-court identifications: just before the jury was excused one evening, Juror One asked, "Why is it when the pictures are presented to the persons, why is it that they don't turn them showing the face instead of the signatures in [sic] the back?"  The court replied, "I can't answer that. . . That's something you'll have to ferret out yourselves."  RT 331.  In addition, both defense counsel, for petitioner and for Carr, cross-examined the witnesses at length about their identifications, highlighting the problems with the identifications.  For example, Weaver identified petitioner as the man who stood near the teller line, while other witnesses identified him as the man who pushed Howton and later herded them into the vault.  <u>Compare</u> RT 100 <u>and</u> 208-209.  McCullough, who had chased the robbers through the residential neighborhood around the credit union, identified petitioner as the man who gave him the beeper number, though Johnson testified that he had done so.  <u>Compare</u> RT 307 <u>and</u> 665.  Nevertheless,

several of the witnesses who identified petitioner in the courtroom were certain of their identifications. Although Goedde was hesitant, she said this stemmed from petitioner's presence in the courtroom; her identification of him in the courtroom was nevertheless definite. RT 222, 226-227. Both Drobny and Howton identified petitioner with little hesitation. RT 510, 577. Moreover, the robbery took place during the daylight hours, the robbers wore no disguises, and the witnesses had several minutes to observe them. RT 80, 82 (robbery was just around noon); RT 486, 496 (Howton observed petitioner for two periods of about thirty seconds to a minute each).

There was other evidence of petitioner's guilt. Johnson, who was arrested with Carr in his Honda, testified that Tyrone Harris, another of the robbers, introduced petitioner as his uncle; Johnson testified that he also met petitioner's girlfriend Leslie, who drove petitioner and Harris to and from the area around the credit union. RT 627-628, 639-640, 643, 647. Johnson identified petitioner as the robber who had been wearing the white jacket. RT 908-909. In addition, the jury saw portions of Carr's videotaped statement, in which he identified the robber in the white jacket who grabbed Howton and then directed everyone into the vault as Harris's uncle who had moved to Sacramento from Los Angeles. Clerk's Augmented Transcript (ACT) 8, 12-13, 28, 49, 50. Testifying in his own behalf, petitioner acknowledged he was Harris's uncle and had lived in Los Angeles. RT 1238, 1261.

Given the record as a whole, the prosecutor's manner of eliciting in-court identifications did not have a substantial and injurious effect on the jury's verdict.

C. Ineffective Assistance Of Counsel

Petitioner argues that trial counsel was ineffective for failing to object to the prosecutor's use of the signed lineup photographs as a means of establishing an in-court identification. Pet. at 10. As noted above, the state Court of Appeal found that petitioner had not established prejudice from the failure to object.

/////

> The federal law on claims of attorney ineffectiveness is clear: First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.

Strickland v. Washington, 466 U.S. 668, 687 (1984). "[T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." Id. at 688.

It also is petitioner's burden to establish prejudice: "A defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. However, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." Id. at 697.

Petitioner cannot show prejudice in this case, for he cannot show that the witnesses who identified him as the robber in the white jacket would not have been able to do so without looking at the photo lineup and their signatures on petitioner's picture. As noted above, the witnesses had the chance to observe the undisguised robbers for two minutes or more in the daylight. Moreover, several of those who could not identify anyone in court had selected petitioner's picture from the photo array, admissible evidence which the jury heard. See RT 62, 72, 75 (Wilhelm), 251 (Tomlinson). Here again, the Court of Appeal did not apply federal constitutional law unreasonably in finding that petitioner had not shown prejudice from counsel's failure to object.

IV. The Admission Of Carr's Statement

Carr gave a lengthy statement to authorities, describing the robbery and its participants. ACT 2-84. He identified his co-participants as his cousin, Johnson, Tyrone and Tyrone's uncle, who had been wearing a white jacket. ACT 4, 6, 8. The uncle, who had moved here from Los Angeles, was in charge of the robbery. ACT 49, 50. Carr said he knew a girl

named Gilcrest[3], but did not think anybody by that name lived near his house.  ACT 83.

Petitioner and Carr were tried jointly, with a single jury.  On the first day of trial, petitioner's lawyer did not object to the jury seeing the videotape of Carr's statement.  RT 16. Before and after the tape was played, the court instructed the jury that Carr's statement was admissible as to defendant Carr only and should not be considered for any other purpose. RT 613, 615-616.

Petitioner's lawyer told the court he wanted to call Carr as a witness.  Outside the presence of the jury, Carr's lawyer informed the court that Carr wanted to testify "because he feels that Mr. Gilchrist is not the person that was involved."  However, Carr accepted his lawyer's advice that he should not testify.  RT 1233.  The next day, petitioner's lawyer reiterated his desire to call Carr as a witness and explained that Carr had declined to testify because he believed he would be given a longer sentence if he did.  RT 1314-1315.  Carr's lawyer again told the court that he had advised his client against testifying.  RT 1317.

During deliberations, the jury asked for the transcript of Carr's statement. CT 177.

After trial, the court appointed new counsel, who filed a motion for a new trial on petitioner's behalf; one ground was ineffective assistance of counsel based on trial counsel's failure to object to the admission of Carr's statement to law enforcement.  CT 234-235.   At the hearing on the motion, trial counsel testified that he decided to "let the tape go" because he believed that Carr was going to testify that petitioner was not the uncle Carr had identified as the moving force behind the robbery.  RT 1650.  Counsel knew, however, that he could have put off determining whether to object to the tape until he was finally certain that Carr was going to testify.  RT 1651.  Finally, counsel acknowledged that he was not able to overcome the damage caused by the admission of the statement because Carr did not testify and because other evidence

---

[3]  This is the spelling of the name in the transcript of Carr's interview.

1   he had been led to believe existed did not materialize.  RT 1652.

2            The court denied the motion, in part because trial counsel was able to use Carr's

3   statement, which showed Johnson was involved in the planning, to discredit Johnson, who

4   testified that he did not know that a robbery had occurred until Carr, Harris and petitioner

5   returned to the cars.  RT 1695.

6            The Court of Appeal found that the admission of Carr's statement had indeed

7   been error, but found it harmless:

8            There was abundant eyewitness identification testimony placing an
             armed defendant inside the credit union.  Credit union employees
9            Howton, Drobny and Black and customer Goedde, despite attacks
             on their credibility, all positively identified defendant from
10           photographs and in court as one of the robbers.  In addition,
             codefendant Johnson's testimony, independently of any reference
11           to defendant as Tyrone's uncle, placed defendant with the other
             robbers at the credit union both prior to and immediately after the
12           robbery.  It is not reasonable to suspect that but for counsel's
             alleged error in waiving objections to Carr's statements, the jury
13           would have arrived at a different verdict.

14   Answer, Ex. D at 26.

15           Johnson testified that he met petitioner, who was introduced to him as Harris's

16   uncle, and the uncle's girlfriend.  RT 627-628.  Johnson said that Tyrone and petitioner and

17   petitioner's girlfriend left Tyrone's grandmother's house in the girlfriend's car, a white two door

18   sedan, maybe a Pontiac Grand Prix, maybe a Chevy Lumina, from the 1990s.  RT 640.  Leslie

19   Harris, petitioner's girlfriend, confirmed that she owned a white Pontiac Grand Prix with a red

20   stripe around it, though she denied driving that car to the Golden One Credit Union on October 8,

21   1998.  RT 1180, 1191.

22           Shortly after the robbery, as previously described, Detective Minter showed photo

23   arrays to the employees and customers of the credit union.  Howton selected two photos from the

24   lineup containing petitioner's picture and testified that she believed petitioner's picture looked

25   more like the robber who threw her down.  RT 505-508.  Drobny and Black selected petitioner's

26   picture, saying they were certain he was one of the robbers.  RT 576-577 (Drobny), 135 (Black).

1   Goedde and both Tomlinsons also selected petitioner's picture from the photo lineups shown to

2   them.  RT 221-222 (Goedde), 251-252 (Kenneth Tomlinson), 268 (Anna Marie Tomlinson).

3   McCollough identified petitioner's picture as showing one of the men he chased through the

4   residential area around the credit union.  RT 304.

5            Johnson's testimony, combined with the eyewitness testimony, was sufficient for

6   the jury to find petitioner guilty.  Trial counsel's error in failing to object to Carr's statement did

7   not have a substantial and injurious effect on the jury; petitioner has not shown a reasonable

8   possibility that the result of the trial would have been different in the absence of counsel's error.

9   See Spears v. Mullin, 343 F.3d 1215 (10th Cir. 2003) (Bruton[4] error harmless when other

10  witnesses testified consistently about the murder); see Schneble v. Florida, 405 U.S. 427 (1972)

11  (Bruton error harmless when out of court statement only corroborated defendant's confession).

12  The Court of Appeal did not err in reaching this conclusion.

13  V.   The Motion To Expand The Record And Innocence

14           Petitioner has asked the court to expand the record to include a number of law

15  enforcement reports recounting witness interviews.  This request is not opposed and is

16  appropriately granted.  Rule 7, Rules Governing § 2254 Proceedings.

17           Petitioner suggests that these reports, which reflect some inconsistencies with the

18  testimony at trial, show that the jury convicted an innocent man.  To the extent petitioner is

19  making a freestanding claim of actual innocence under Herrera v. Collins, 506 U.S. 390 (1993),

20  it is unavailing.  As the Ninth Circuit has recognized, there is an "extraordinarily high" standard

21  for such a claim, which requires petitioner to "go beyond demonstrating doubt about his guilt and

22  . . . affirmatively prove that he is probably innocent."  Boyde v. Brown, 404 F.3d 1159, 1168 (9th

23  Cir.), as amended on rehearing, 421 F.3d 1154 (2005).  A claim must be based on reliable

24  evidence not presented at trial.  Schlup v. Delo, 513 U.S. 298, 324 (1995); Calderon v.

25  _____

26           [4] Bruton v. United States, 391 U.S. 123 (1968).

22

1    Thompson, 523 U.S. 538, 559 (1998).

2              The reports petitioner has submitted recount interviews with Howton, Hufnagle,

3    Kenneth Tomlinson and Goedde.  These were available at trial and in fact were often used by

4    trial counsel in cross-examining these witnesses.  Petitioner has not borne his burden of showing

5    actual innocence.

6              IT IS HEREBY ORDERED that petitioner's motion for expansion of the record is

7    granted.

8              IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

9    habeas corpus be denied.

10             These findings and recommendations are submitted to the United States District

11   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

12   days after being served with these findings and recommendations, any party may file written

13   objections with the court and serve a copy on all parties.  Such a document should be captioned

14   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

15   shall be served and filed within ten days after service of the objections.  The parties are advised

16   that failure to file objections within the specified time may waive the right to appeal the District

17   Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

18   DATED:  August 24, 2007.

19

20

21                                          U.S. MAGISTRATE JUDGE

22

23

24

25

26   2/gilc0920.157